******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* MORLO M.*
## (AC 41474)

Bright, C. J., and Alvord and Norcott, Js.

*Syllabus*

Convicted of the crimes of assault in the first degree, risk of injury to a child and unlawful restraint in the first degree in connection with the beating of the victim, who was the mother of his four minor children, the defendant appealed to this court, claiming that the evidence was insufficient to support his conviction. The defendant had dragged the victim by her hair down stairs into the basement of their home, where he kicked, punched and choked her on three consecutive nights while the children, who ranged in age from fifteen months to thirteen years, were alone on the upper floors of the home. After the defendant left the house on the third day, the victim was brought to a medical center, where staff members observed bruising on her scalp, face, chest, back, legs, arms and left side. The victim also was determined to have had a subconjunctival hemorrhage in her left eye, a broken rib and fluid in her pelvic region. *Held*:

1. The defendant could not prevail on his claim that the state failed to prove that he caused the victim serious physical injury and, thus, that the evidence was insufficient to support his conviction of assault in the first degree: the jury reasonably could have found that the defendant caused the victim to suffer either serious disfigurement or a serious loss or impairment of the function of any bodily organ and, thus, a serious physical injury, as the victim and C, a medical center staff member, testified consistently with one another as to the extensive bruising that covered much of the victim's body, the noticeable injuries to her head and face, and that the victim had lost consciousness during one of the defendant's beatings of her, which the jury was free to credit or to disregard; moreover, C testified that the bruising was literally everywhere on the body of the victim, who had a subconjunctival hemorrhage in her left eye, and a police officer who took the victim's statement at the medical center saw that she was missing hair and had a swollen face and a bloodshot eye.

2. The defendant's claim that the evidence was insufficient to support his conviction of risk of injury to a child was unavailing; the jury reasonably could have inferred that the defendant put the children at risk of impairment of their health or morals, as the children had no access to parental care during the three nights when he beat the victim in the basement and did not permit her to leave the basement until the morning, the jury was free to credit a psychologist's testimony that the children may have been traumatized as a result of having observed the extensive physical injuries to the victim, and the state did not have to prove actual harm to the children, as the defendant was charged under the portion of the risk of injury statute (§ 53-21 (a) (1)) that required that he have the general intent to perform an act that created a situation that put the children's health and morals at risk of impairment.

3. The evidence was sufficient to support the defendant's conviction of unlawful restraint in the first degree, as the defendant's intent to unlawfully restrain the victim was independent from his intent to assault her: the jury reasonably could have found that the defendant evinced an intent to restrict the victim's liberty to move freely within the house when he seized her by her hair and dragged her into the basement and separately could have reasonably found that he evinced an extreme indifference to human life on the basis of his independent acts of kicking, punching and choking the victim in the basement for three consecutive nights; moreover, the jury reasonably could have found that the defendant's act of dragging the victim down a full flight of stairs by her hair subjected her to a substantial risk of injury, as it presented a real or considerable opportunity for her to have suffered an impairment to her physical condition or to have suffered pain.

4. The trial court did not abuse its discretion in admitting prior misconduct evidence pertaining to two other incidents in which the defendant was

alleged to have assaulted the victim, as that evidence was relevant to the charges of unlawful restraint and tampering with a witness, and its probative value was not outweighed by its prejudicial impact: the prior misconduct evidence was relevant to and probative of the defendant's intent to restrain the victim and to tamper with a statement she had given to the police, as both unlawful restraint in the first degree and tampering with a witness are specific intent crimes, and the prior misconduct evidence was not likely to arouse the jurors' emotions and sympathy toward the victim, and was not distracting in terms of its severity and the amount of time and focus that it involved; moreover, the two incidents of prior misconduct did not involve gruesome details, facts or photographs, whereas the crimes of which the defendant was convicted involved conduct and injuries that were substantially more gruesome in nature, and the court provided a limiting instruction to the jury on the first day of evidence, coincident with the admission of the prior misconduct evidence, which restricted the parameters of the state's use of the evidence to limit its prejudicial effect.

Considered April 1—officially released August 10, 2021

*Procedural History*

Two substitute informations charging the defendant, in the first case, with five counts of the crime of risk of injury to a child and with one count of the crime of tampering with a witness, and, in the second case, with the crimes of assault in the first degree, unlawful restraint in the first degree and strangulation in the first degree, brought to the Superior Court in the judicial district of Fairfield, where the court, *Kavanewsky, J.*, granted the state's motion for joinder; thereafter, the matter was tried to the jury before *Pavia, J.*; subsequently, the court denied the defendant's motion to preclude certain evidence; verdicts and judgments of guilty of five counts of risk of injury to a child, tampering with a witness, assault in the first degree and unlawful restraint in the first degree, from which the defendant appealed to this court. *Affirmed.*

*Judie Marshall*, assigned counsel, with whom, on the brief, was *David J. Reich*, assigned counsel, for the appellant (defendant).

*Linda F. Currie-Zeffiro*, assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Colleen Zingaro*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Morlo M., appeals from the judgments of conviction, rendered following a jury trial, of one count of assault in the first degree in violation of General Statutes § 53a-59 (a) (3), five counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (1), one count of unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a), and one count of tampering with a witness in violation of General Statutes § 53a-151.[1] On appeal, the defendant claims that the evidence was insufficient to support his conviction of (1) assault in the first degree, (2) risk of injury to a child (3) and unlawful restraint in the first degree, and that (4) the trial court abused its discretion in admitting evidence of his prior misconduct.[2] We affirm the judgments of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to this appeal. In the early morning hours of November 28, 2016, the victim, who is the mother of the defendant's four minor children, called the defendant from a gas station to ask that he pick her up and drive her back to the house where they both resided. The victim had been out drinking with someone other than the defendant. Soon after the victim and the defendant arrived at the house, the defendant seized the victim by her hair, dragged her down to the basement of the house, and proceeded to beat her. The defendant kicked, punched, and choked the victim. During this time, the victim's seven children were asleep on upper floors of the house[3] and, thus, did not witness the victim being dragged down into the basement by the defendant. The victim could not leave the basement until the defendant ceased beating her. Subsequently, in the morning of November 28, the victim and the defendant emerged from the basement and sat on their living room couch. The victim remained on the couch throughout the daytime hours of November 28 because of the injuries she sustained from the defendant's beating of her. While the victim remained on the couch, her older children were at school, and her sixteen year old nephew assisted her by caring for her young children. Following the older children's return from school, all of the children were fed and went upstairs.

At nighttime on November 28, 2016, the defendant commanded the victim to return down into the basement. The victim obeyed the defendant's command because she was already hurt and did not want to defy him. The children were upstairs and in their beds when the victim and the defendant went down into the basement. Once they were in the basement, the victim again was beaten by the defendant. The defendant hit and choked the victim, and ripped out parts of her hair.

In the early morning of November 29, 2016, the victim

emerged from the basement after a second night of being beaten. The victim's children were still asleep when the victim came up from the basement. The victim spent that day as she spent the day before, resting on the couch. Although she did not know the extent of her injuries, the victim was in pain and thought that she might have broken ribs. Following the return of the older children from school, all of the children were fed and then went upstairs. The victim again was beaten on November 29 for a third night in a row. On one of the three nights during which she was beaten, the victim lost consciousness. Following the beatings, the victim's side and head in particular were hurting her.

When the defendant left the house on the third day, the victim contacted a friend, F, who picked up the victim, her seven children, and her nephew, and took them all to a hotel. The victim left the house in a rush, fearing that if she remained there any longer, she would die. The victim's injuries were visible and seen by her children. While at the hotel, the victim, a veteran of the armed forces, called her peer counselor at the United States Veterans Administration Hospital. The victim informed her counselor that she was in pain, had a limited amount of money, and needed to travel to her foster mother in Georgia. The victim's counselor first encouraged the victim to seek treatment at the Veterans Affairs Medical Center in West Haven (medical center). On December 2, 2016, after encouragement from her counselor and because she remained in pain, wanted to know the extent of her injuries, and desired treatment, the victim went to the medical center with her children and nephew. At the medical center, the victim had her injuries photographed, vitals measured, and body imaged. A blood test also was performed. Staff at the medical center observed that the defendant had bruising on her scalp, face, chest, back, legs, arms, and left side. Some of the bruises were more recent than others. The victim also had a subconjunctival hemorrhage in her left eye, parts of her hair torn out, and tenderness in sections of her body, particularly her left chest and left abdomen.

The victim told medical center staff that over the last few days she had been kicked, punched, dragged by her hair, choked, and that she lost consciousness. Initially, the victim did not disclose who caused her injuries to medical center staff. Eventually, however, the victim did tell the staff that the defendant caused her injuries. The police and the Department of Children and Families (department) were summoned to the medical center and, upon their arrival, took sworn, written statements from the victim. Officer Jonathan Simmons, of the Bridgeport Police Department, who took the victim's statement at the medical center, observed the victim as having parts of her hair missing, a swollen face, and a bloodshot eye.

The victim was evaluated by Julia Chen, a resident at the medical center who specialized in vascular and general surgery. Imaging revealed that one of the victim's ribs on her left side was fractured and that there was indeterminate fluid in her pelvic region. On the basis of the location of the victim's bruising and the fluid in her pelvic region, Chen and other staff at the medical center were concerned that the victim might have had an injury to her spleen. There also was concern that the victim might be bleeding internally. It was recommended to the victim that she be evaluated at Yale-New Haven Hospital (hospital) because the hospital had a trauma center and the medical center did not. Although Chen was not concerned that the victim faced an immediate risk of death, she recommended further evaluation because she was concerned that the victim had very serious internal injuries. Moreover, although Chen could not conclusively determine that the victim's spleen was injured, her concern prompted a recommendation that the victim pursue further evaluation because "a splenic hemorrhage could be very bad."

Contrary to the medical advice given to her, the victim did not seek further evaluation at the hospital and discharged herself from the medical center. The victim did not seek further evaluation at the hospital because she could not take her children with her. Following her discharge from the medical center, the victim received assistance from a battered women's shelter that enabled her, her children, and her nephew to stay at a hotel. On December 5, 2016, they all checked out of the hotel and rode a bus to the home of the victim's foster mother in Georgia.

While in Georgia, F contacted the victim and urged her to speak with the defendant. F told the victim that the defendant wanted to speak with their twin children because it was their birthday. The victim spoke with the defendant several times while she was in Georgia. During one of their conversations, the victim told the defendant that she had made a statement to the police that identified him as the cause of her injuries. The defendant told the victim that she had to return to Connecticut to "fix" her statement so that he would not get into any trouble.

Following this conversation, the defendant drove to Georgia. After arriving at the home of the victim's foster mother in Georgia, the defendant picked up the victim and five children and proceeded to drive back to Connecticut.[4] They arrived in Connecticut on December 20, 2016, and stayed at the apartment of the defendant's sister. On December 21, the defendant drove the victim to the police station, where she changed her statement to the police at the defendant's behest. The victim changed her statement to allege that another male was the cause of her injuries. The victim and the defendant then returned to the apartment.

Thereafter, on December 21, 2016, police officers travelled to the apartment. The police officers were met by an adult male and female, who provided no information regarding the whereabouts of the defendant, the victim, or the victim's children. As the police officers were leaving, they observed a child in the living room area of the apartment through a window. At approximately 4:30 p.m. on December 22, the police officers returned to the apartment with a warrant for the defendant's arrest. The victim, who was outside as the police arrived, ran into the apartment, gathered her children, and brought them down into the basement. The police officers located the defendant outside the apartment, in the process of moving a television, and executed the arrest warrant. The police officers then entered the house and found the victim and her children in the basement.

Subsequently, the defendant was charged in two consolidated informations with assault in the first degree, unlawful restraint in the first degree, strangulation in the first degree, five counts of risk of injury to a child, and tampering with a witness. The jury found the defendant guilty of all counts with the exception of strangulation in the first degree, of which he was found not guilty. The defendant received a total effective sentence of fifteen years of incarceration, execution suspended after ten years, followed by five years of probation.[5] This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that there was insufficient evidence to convict him of assault in the first degree because the state failed to prove that he caused serious physical injury to the victim. We disagree.

At the outset, we set forth the following established review principles relevant to each of the defendant's insufficiency of the evidence claims raised in this appeal. "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We also note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may

consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Additionally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is reasonable view of the evidence that supports the [jury's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Taupier*, 330 Conn. 149, 186–87, 193 A.3d 1 (2018), cert. denied, U.S. , 139 S. Ct. 1188, 203 L. Ed. 2d 202 (2019).

Section 53a-59 (a) provides in relevant part that "[a] person is guilty of assault in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person . . . ."[6] General Statutes § 53a-3 (4) defines "serious physical injury" as "physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ . . . ." "Whether an injury constitutes a 'serious physical injury' . . . is a fact intensive inquiry and, therefore, is a question for the jury to determine." *State* v. *Irizarry*, 190 Conn. App. 40, 45, 209 A.3d 679, cert. denied, 333 Conn. 913, 215 A.3d 1210 (2019). "[Despite] the difficulty of drawing a precise line as to where physical injury leaves off and serious physical injury begins . . . we remain mindful that [w]e do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record . . . and that we must construe the evidence in the light most favorable to sustaining the verdict." (Internal quotation marks omitted.) Id., 45 n.6.

We conclude that there was sufficient evidence to support the jury's finding that the defendant caused serious physical injury to the victim. The jury reasonably could have concluded that the defendant caused the victim either serious disfigurement or serious loss or impairment of the function of any bodily organ.

" 'Serious disfigurement' is an impairment of or injury to the beauty, symmetry or appearance of a person of a magnitude that substantially detracts from the person's appearance from the perspective of an objective observer. In assessing whether an impairment or injury constitutes serious disfigurement, factors that may be

considered include the duration of the disfigurement, as well as its location, size, and overall appearance. Serious disfigurement does not necessarily have to be permanent or in a location that is readily visible to others." *State* v. *Petion*, 332 Conn. 472, 491, 211 A.3d 991 (2019).

In *State* v. *Barretta*, 82 Conn. App. 684, 846 A.2d 946, cert. denied, 270 Conn. 905, 853 A.2d 522 (2004), the following evidence was presented concerning the victim's injuries: "[T]he victim sustained numerous severe bruises, abrasions and contusions across the trunk of his body. He also had an imprint and welts on his back that caused his skin to be a varied color of purple and blue, with additional visible injuries to his upper left shoulder and neckline. Further abrasions were visible on his collarbone, and there were bruises on his breastbone. Additionally, the medical testimony, given by an attending physician's assistant, described extensive and severe bruising that covered more of the victim's body than the photographs reflected and caused the victim to be tender to pressure across his back and left side." Id., 690. This court noted that "the term 'serious physical injury' does not require that the injury be permanent," "a victim's complete recovery is of no consequence," and "the fact that the skin was not penetrated [is not] dispositive." Id., 689–90. On the basis of the evidence in the *Barretta* record, this court could not conclude that the jury unreasonably found that the victim suffered serious physical injury, namely, serious disfigurement. Id., 690.

In this case, the victim and Chen testified consistently with one another as to the extensive bruising that covered the victim's body. The victim's scalp, face, chest, back, legs, arms, and left side were all bruised. Chen testified that the victim's bruising was "literally everywhere . . . ." Moreover, the victim had a subconjunctival hemorrhage in her left eye, had portions of her hair torn out, and experienced tenderness in various parts of her body. Simmons corroborated the visibility of the victim's injuries, noting that when he met with her at the medical center, he observed her as having missing hair, a swollen face, and a bloodshot eye. In addition, photographs of the victim's injuries were admitted into evidence for the jury to view during its deliberations. Although there was no evidence that the victim's injuries left permanent scarring, there was ample evidence as to the visibility of the bruising that covered much of the victim's body and of the noticeable injuries to her head and face. Under the factors set forth in *Petion*, and in light of the guidance of *Barretta*, we cannot conclude that there was insufficient evidence from which the jury could find that the victim suffered serious disfigurement and, thus, serious physical injury.[7]

We now turn to whether the jury reasonably could have concluded that the defendant caused the victim

serious loss or impairment of the function of any bodily organ.[8] In *State* v. *Rumore*, 28 Conn. App. 402, 613 A.2d 1328, cert. denied, 224 Conn. 906, 615 A.2d 1049 (1992), this court held that the jury reasonably could have concluded that the victim suffered serious impairment of the function of any bodily organ on the basis of evidence that the victim became unconscious after the defendant grabbed her by her ankles, causing her to fall to the ground. Id., 405, 415. More specifically, the court stated that § 53a-3 (4) "does not require that the impairment of the organ be permanent. The jury could properly interpret the evidence to prove that the victim's brain was not functioning at a cognitive level when she was unconscious and thus was impaired." Id., 415. In this case, the victim testified that, during one of the three nights when she was beaten by the defendant in the basement, she lost consciousness. The victim's testimony was corroborated by Chen, who testified that the victim informed medical center staff that she lost consciousness at some point during the defendant's repeated beating of her. The jury was free to credit or disregard this testimony.[9] See id. ("[i]t is axiomatic that it is the function of the jury to consider the evidence, draw reasonable inferences from the facts proven and to assess the credibility of witnesses"). On the basis of this testimony, we conclude that there was sufficient evidence from which the jury reasonably could have found that the victim suffered a serious loss or impairment of the function of any bodily organ and, thus, a serious physical injury.[10] See id.

II

The defendant next claims that there was insufficient evidence to convict him of five counts of risk of injury to a child. The defendant argues that his conviction of those counts was predicated on the children having been found by the police in the basement of the apartment and that he "did nothing to encourage or orchestrate the children being placed in the basement." (Emphasis omitted.) The state responds that "the cumulative force of the evidence established that the defendant's conduct—beating the children's mother—led to a series of situations inimical to the children's psychological or mental health." We agree with the state and, accordingly, reject the defendant's claim.

Section 53-21 (a) provides in relevant part that "[a]ny person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of (A) a class C felony for a violation of subdivision (1) . . . ." "The general purpose of § 53-21 is to protect the physical and psychological well-being of children from the

potentially harmful conduct of adults. . . . Our case law has interpreted § 53-21 [a] (1) as comprising two distinct parts and criminalizing two general types of behavior likely to injure physically or to impair the morals of a minor under sixteen years of age: (1) deliberate indifference to, acquiescence in, or the creation of situations inimical to the minor's moral or physical welfare . . . and (2) acts directly perpetrated on the person of the minor and injurious to his moral or physical well-being. . . . Thus, the first part of § 53-21 [a] (1) prohibits the creation of *situations* detrimental to a child's welfare, while the second part proscribes injurious *acts* directly perpetrated on the child. . . .

"Under the situation portion of § 53-21 [a] (1), the state need not prove actual injury to the child. Instead, it must prove that the defendant wilfully created a situation that posed a risk to the child's health or morals. . . . The situation portion of § 53-21 [a] (1) encompasses the protection of the body as well as the safety and security of the environment in which the child exists, and for which the adult is responsible." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Padua*, 273 Conn. 138, 147–48, 869 A.2d 192 (2005). "Because risk of injury to a child is a general intent crime, proof of [s]pecific intent is not a necessary requirement . . . . Rather, the intent to do some act coupled with a reckless disregard of the consequences . . . of that act is sufficient to [establish] a violation of the statute. . . . As a general intent crime, it is unnecessary for the [defendant to] be aware that his conduct is likely to impact a child [under age sixteen]." (Citations omitted; internal quotation marks omitted.) *State* v. *James E.*, 327 Conn. 212, 223, 173 A.3d 380 (2017).

In a substitute information, the state charged the defendant with five counts of risk of injury to a child in connection with conduct "beginning on or about November 27, 2016 through December 22, 2016," that "wilfully and unlawfully cause[d] a child under sixteen (16) years of age . . . to be placed in a situation that his health and morals were likely to be impaired."[11] The information thus reflects that the state charged the defendant under the "situation" portion of § 53-21 (a) (1). Accordingly, the state did not have to prove actual harm to the children but, rather, that the defendant had the general intent to perform an act that created a situation putting the children's health and morals at risk of impairment. We conclude that there was sufficient evidence from which the jury reasonably could have found the defendant guilty of five counts of risk of injury to a child.

On three consecutive nights, the defendant, by forcing the victim down into the basement, beating her, and not permitting her to leave the basement until morning when they went up together, rendered the victim inca-

pable of caring for her children, who ranged in age from fifteen months to thirteen years and were located alone on the upper floors of their home. In so doing, the defendant risked the health of the minor children, as they had no access to parental care during these three nights. See *State* v. *Branham*, 56 Conn. App. 395, 398–99, 743 A.2d 635 (evidence that defendant left three young children unattended in apartment for approximately one hour deemed sufficient for jury to find that physical well-being of children was put at risk), cert. denied, 252 Conn. 937, 747 A.2d 3 (2000); *State* v. *George*, 37 Conn. App. 388, 389–90, 656 A.2d 232 (1995) (affirming defendant's conviction of risk of injury to child for leaving seventeen month old infant unattended in car between 8 and 9 p.m.).[12]

Moreover, the defendant's beating of the victim left her with numerous, visible physical injuries that were observed by the children. At trial, Wendy Levy, a clinical psychologist, testified that children witnessing a caregiver with physical injuries caused by abuse can be traumatized because they could develop a fear that they, too, will be subjected to abuse. The jury was free to credit Levy's testimony and to infer that, because the children in this case observed the extensive physical injuries to the victim, their mother and caregiver, they may have been traumatized. See, e.g., *State* v. *Thomas W.*, 115 Conn. App. 467, 475, 974 A.2d 19 (2009), aff'd, 301 Conn. 724, 22 A.3d 1242 (2011); see id., 475–76 ("[I]t is within the province of the jury to draw reasonable and logical inferences from the facts proven. . . . The jury may draw reasonable inferences based on other inferences drawn from the evidence presented." (Internal quotation marks omitted.)). Because the defendant's beating of the victim established this potential sequence, the jury reasonably could have inferred that he put the children at risk of impairment of their health and morals.

### III

The defendant's next claim is that there was insufficient evidence to convict him of unlawful restraint in the first degree because there was no evidence presented to the jury of (1) a substantial risk of injury to the victim or (2) an intent to unlawfully restrain that was independent from his intent to commit assault under § 53a-59 (a) (3). We disagree.

Under § 53a-95 (a), "[a] person is guilty of unlawful restraint in the first degree when he restrains another person under circumstances which expose such other person to a substantial risk of physical injury." "'Restrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent."

General Statutes § 53a-91 (1). "Physical injury" is defined as "impairment of physical condition or pain . . . ." General Statutes § 53a-3 (3). "Merriam-Webster's Collegiate Dictionary (10th Ed. 1999) defines 'substantial' as 'real' and 'considerable,' and courts often have defined the word 'substantial' in that way." *State* v. *Dubose*, 75 Conn. App. 163, 174–75, 815 A.2d 213, cert. denied, 263 Conn. 909, 819 A.2d 841 (2003).

"Unlawful restraint in the first degree is a specific intent crime. . . . A jury cannot find a defendant guilty of unlawful restraint unless it first [finds] that he . . . restricted the victim's movements with the intent to interfere substantially with her liberty. . . . [A] restraint is unlawful if, and only if, a defendant's conscious objective in . . . confining the victim is to achieve that prohibited result, namely, to restrict the victim's movements in such a manner as to interfere substantially with his or her liberty." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Jackson*, 184 Conn. App. 419, 433–34, 194 A.3d 1251, cert. denied, 330 Conn. 937, 195 A.3d 386 (2018). "To convict a defendant of unlawful restraint in the first degree, no actual physical harm must be demonstrated; the state need only prove that the defendant exposed the victim to a substantial risk of physical injury." (Internal quotation marks omitted.) *State* v. *Cotton*, 77 Conn. App. 749, 776, 825 A.2d 189, cert. denied, 265 Conn. 911, 831 A.2d 251 (2003).

We reject the defendant's argument that, under the circumstances of this case, the intent to commit unlawful restraint under § 53a-95 (a) was one and the same with the intent to commit the assault in the first degree under § 53a-59 (a) (3). Our appellate guidance reflects that the requisite mental states for each crime are distinct from one another. Compare *State* v. *Colon*, 71 Conn. App. 217, 226, 800 A.2d 1268 (concluding that § 53a-59 (a) (3) requires that the defendant "must be shown to have had *the general intent to engage in conduct evincing an extreme indifference to human life*" (emphasis added)), cert. denied, 261 Conn. 934, 806 A.2d 1067 (2002), with *State* v. *Jackson*, supra, 184 Conn. App. 433 ("[a] jury cannot find a defendant guilty of unlawful restraint unless it first [finds] that he . . . restricted the victim's movements with *the intent to interfere substantially with her liberty*" (emphasis added; internal quotation marks omitted)). The victim testified that, in the early morning hours of November 28, 2016, the defendant seized her by her hair and dragged her down into the basement, where he proceeded to beat her. On the basis of this evidence, the jury reasonably could have found that the defendant evinced an intent to restrict the victim's liberty, namely, her liberty to move freely within the house. Separately, the jury reasonably could have found that the defendant evinced an extreme indifference to human life on the basis of his independent acts of kicking, punching, and

choking the victim in the basement for three consecutive nights after dragging her down the stairs.[13]

We further reject the defendant's argument that there was insufficient evidence of a substantial risk of injury to the victim. On the basis of the evidence presented at trial, the jury reasonably could have found that the defendant's act of dragging the victim down a full flight of stairs by her hair subjected her to a substantial risk of injury because it presented a "real" or "considerable" opportunity for her to have suffered an impairment to her physical condition or to have suffered pain. See General Statutes § 53a-3 (3); *State* v. *Dubose*, supra, 75 Conn. App. 174–75.

IV

The defendant's final claim is that the trial court abused its discretion in admitting evidence of his prior misconduct on the ground that it was relevant and that its probative value outweighed its prejudicial tendencies. In response, the state maintains that the trial court acted well within its discretion in admitting the prior misconduct evidence after finding it relevant and not unduly prejudicial. We agree with the state.

The following additional facts and procedural history are relevant to the defendant's claim. On September 20, 2017, pursuant to § 4-5 of the Connecticut Code of Evidence, the state filed a notice of misconduct evidence regarding its intent to offer evidence of other crimes, wrongs or acts involving the defendant and the victim.[14] In its September 20, 2017 notice of misconduct evidence, the state set forth specific incidents of prior misconduct involving the defendant and the victim, as well as its intent to offer additional evidence with respect to the "violent and abusive nature of [their] relationship . . . ." The specific incidents of prior misconduct included (1) "[a]n assault by the defendant, which caused injuries to [the victim] as well as her sister . . . [that] included a broken neck in December of 2011" (first assault),[15] and (2) "[a]n assault by the defendant on [the victim] wherein he hit [her] in the head with a dog chain, causing [an] injury to [her] head" (second assault).[16] The state argued that the prior misconduct evidence was admissible because it was "relevant to each of the offenses charged"—assault in the first degree, unlawful restraint in the first degree,[17] strangulation in the first degree, five counts of risk of injury to a child, and tampering with a witness.[18]

Thereafter, on September 20, 2017, the court heard arguments on the defendant's motion in limine. See footnote 14 of this opinion. In support of his argument that the prior misconduct evidence is inadmissible, defense counsel contended that, when the prior misconduct is extrinsic, namely, separate and distinct from the crime charged, the use of uncharged misconduct to prove intent is practically indistinguishable from pro-

hibited propensity evidence. Defense counsel further maintained that the state offered the prior misconduct evidence as being relevant to its proof of the defendant's intent with respect to "all but one of the charges," and that the other grounds of relevance posited by the state do not apply. Given the alleged "problems with the probative value" and "the inflammatory nature of this type of evidence," defense counsel argued, each incident of prior misconduct should be excluded from evidence because "the probative value . . . is far outweighed by [its] prejudicial tendency . . . ."

In response to the defendant's arguments, the prosecutor maintained that the prior misconduct evidence demonstrates the defendant's "ongoing abusive relationship" with the victim, which is "threaded through all of these particular charges" at issue in this case and tends to demonstrate "the reasons for [the victim's] actions." Specifically, the prosecutor argued that the prior misconduct evidence is relevant to "the coercive nature" of the defendant's relationship with the victim, "[the victim's] fear of whether or not she was consenting to going down in the basement and being restrained by the defendant," "whether or not [the victim is going] to try and recant her statement," as well as other "significant and essential elements that the state needs to prove," such as the "fear of [the defendant] and [his] coercive nature that this victim was suffering from" and the defendant's "malice, motive [and] intent."

Citing § 4-5 of the Connecticut Code of Evidence, the court stated that, "for evidence of prior misconduct to fall within the exception of the general rule prohibiting the admission—so again, I do acknowledge that the general rule is to prohibit such admission—the evidence must first be relevant and material to at least one of the circumstances encompassed by the exceptions.[19] And second, the probative value of such evidence must outweigh its prejudicial effect. And so we have a two part test that needs to be addressed." (Footnote added.) Moreover, the court "agree[d] with the defen[dant] that certainly evidence of wrongful acts or uncharged misconduct [is] not relevant to try to suggest that because a defendant has done something in the past that . . . therefore, he has done [it] in this case as well. And, therefore, it is necessary to find this nexus in terms of the intent, identity, malice, motive aspect with regard to the admission of [the] misconduct."

The court first concluded that the prior misconduct evidence was not relevant to the charges of risk of injury to a child or assault in the first degree. Next, the court concluded that the prior misconduct evidence was relevant to the charges of unlawful restraint in the first degree, tampering with a witness and strangulation in the first degree. Specifically, the court stated that, "the tampering, the unlawful restraint and the strangulation all involve different levels of intent. They . . . are

specific intent crimes. And the intents go to different things. And those intents, in this court's opinion, do make the misconduct [evidence] relevant and probative." The court further indicated that, with respect to each of these counts, the state could offer the prior misconduct evidence for "multiple purposes from going to intent, identity, malice, motive, absence of mistake or accident and certainly knowledge and a system of criminal activity." Moreover, the court noted that the prior misconduct evidence "also corroborates evidence that's going to be coming in throughout the course of the trial."

Finally, the court concluded that "the probative value [of the prior misconduct evidence] does outweigh any prejudicial impact." In making this determination, the court stated: "I will give an instruction to the jury talking about the [para]meters that they may use as misconduct and talking about the fact that it does not apply to certain counts. And I will ask the defense to let [the court] know if [he] want[s] that done at the time that the testimony is given specifically. And again, it's probably going to be multiple times. Or to save it for the end of the day or to save it for the jury charge in total."[20] Moreover, in support of this determination, the court stated that "there's nothing that is coming in right now that I'm necessarily finding to be so prejudicial in and of itself that it outweighs the probative value [of the prior misconduct evidence]. Again, I'm not hearing that it involves a knife, that it's gruesome, that it involves facts or pictures that are going to be so prejudicial to this jury that they will not be able to properly evaluate it and properly adhere to the instructions that I give to them, which is to limit it to the [para]meters of the specific charges and the specific purpose of its admission." Accordingly, the court concluded that "the misconduct [evidence] is relevant and probative, and that the probative value outweighs the prejudicial impact as to the counts relating to the unlawful restraint in the first degree, strangulation in the first degree and tampering" with a witness.

At trial, the state offered, and the court admitted, prior misconduct evidence pertaining to the first assault and the second assault.[21] During the prosecutor's direct examination of the victim, the victim testified specifically with respect to the first assault that her "neck was broken" by the defendant, and, with respect to the second assault, that the defendant "beat [her] with a dog chain . . . ." In her closing arguments, the prosecutor referenced specifically the prior misconduct evidence, and referenced generally the history of domestic violence between the victim and the defendant. Of the counts for which the prior misconduct evidence was admitted, the jury found the defendant guilty of unlawful restraint in the first degree in violation of § 53a-95 (a) and tampering with a witness in violation of § 53a-151,[22] and not guilty of strangulation in the first degree.[23]

We begin by setting forth the applicable standard of review and principles of law that guide our analysis. "We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion. . . .

"As a general rule, evidence of prior misconduct is inadmissible to prove that a defendant is guilty of the crime of which he is accused. . . . Nor can such evidence be used to suggest that the defendant has a bad character or a propensity for criminal behavior. . . . In order to determine whether such evidence is admissible, we use a two part test. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of [the prior misconduct] evidence must outweigh [its] prejudicial effect . . . . The primary responsibility for making these determinations rests with the trial court. We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . .

"Under the first prong of the test, the evidence must be relevant for a purpose other than showing the defendant's bad character or criminal tendencies. . . . Recognized exceptions to this rule have permitted the introduction of prior misconduct evidence to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony. Conn. Code Evid. § 4-5 [c]. . . .

"The official commentary to § 4-5 (c) states in relevant part: Admissibility of other crimes, wrongs or acts evidence is contingent on satisfying the relevancy standards and balancing test set forth in Sections 4-1 and 4-3, respectively. For other crimes, wrongs or acts evidence to be admissible, the court must determine that the evidence is probative of one or more of the enumerated purposes for which it is offered, and that its probative value outweighs its prejudicial effect. . . . The purposes enumerated in subsection (c) for which other crimes, wrongs or acts evidence may be admitted are intended to be illustrative rather than exhaustive. Neither subsection (a) nor subsection (c) precludes a court from recognizing other appropriate purposes for which other crimes, wrongs or acts evidence may be admitted, provided the evidence is not introduced to prove a person's bad character or criminal tendencies, and the probative value of its admission is not outweighed by any of the Section 4-3 balancing factors. . . . Conn. Code Evid. § 4-5 (c), commentary." (Citations omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Gerald A.*, 183 Conn. App. 82, 106–107, 191 A.3d 1003, cert. denied, 330 Conn. 914, 193 A.3d 1210 (2018).

On appeal, the defendant claims that the trial court abused its discretion in admitting evidence of his prior misconduct for the state's proof of unlawful restraint in the first degree and tampering with a witness because "[t]he probative value of the prior misconduct evidence on the unlawful restraint and tampering with a witness charges is at best tenuous, if not nonexistent, and is not sufficient to survive the balancing test with its prejudicial tendencies." Specifically, with respect to the probative value of the prior misconduct evidence, the defendant contends that the evidence was not probative of intent, identity, absence of mistake or motive because the prior misconduct and the charges of unlawful restraint in the first degree and tampering with a witness were not factually similar enough in nature. We are not persuaded.

We first consider the probative value of the prior misconduct evidence with respect to the count of unlawful restraint in the first degree. The court found that the prior misconduct evidence was relevant to, inter alia, the defendant's intent to restrain the victim. In admitting the prior misconduct evidence for this purpose, the court relied on *State* v. *Franko*, 142 Conn. App. 451, 64 A.3d 807, cert. denied, 310 Conn. 901, 75 A.3d 30 (2013).

In *Franko*, the defendant appealed from his conviction of one count of kidnapping in the second degree in violation of General Statutes § 53a-94 (a), claiming that "the trial court abused its discretion in denying his motion in limine to exclude certain evidence of prior uncharged misconduct." Id., 453. On appeal, this court determined that prior misconduct evidence of the defendant's "verbal and physical abuse [of the victim] starting three months into their relationship"; id., 455–56; was relevant to the defendant's "intent to abduct the victim, and thereby restrain the victim's movement on the date of the kidnapping." Id., 461. Specifically, this court determined that, "[a]lthough there is no element in the kidnapping statutes that explicitly requires proof of the victim's state of mind, [our Supreme Court] has stated that evidence that is probative of the victim's state of mind may be admissible . . . when that state of mind is independently relevant to other material issues in the case. . . . Thus, when a defendant . . . is charged with [second] degree kidnapping and the jury is instructed on the meaning of abduct, which requires a finding that the defendant restrained the victim with intent to prevent his liberation by . . . using or threatening to use physical force or intimidation . . . the trial court may allow the jury to consider evidence that the victim reasonably believed that force would be used if he or she tried to escape as proof that the defendant intended to prevent the victim's liberation by threats or intimidation. . . . Because intent is almost always proved, if at all, by

circumstantial evidence, prior misconduct evidence, where available, is often relied upon." (Citations omitted; internal quotation marks omitted.) Id., 461.

In the present case, the court correctly noted that unlawful restraint in the first degree is a specific intent crime. In accordance with the state's burden to prove the essential element of unlawful restraint in the first degree that the defendant restrained the victim, the state was required to prove that the defendant "restrict[ed] [the victim's] movements *intentionally and unlawfully* in such a manner as to interfere substantially with [the victim's] liberty . . . *without consent.*" (Emphasis added.) General Statutes § 53a-91 (1). As in *Franko*, the court in the present case found that the prior misconduct evidence, which tended to demonstrate that the victim reasonably believed that the defendant would use force if she tried to escape, was probative of whether the defendant intended to restrict the victim's movements in such a manner as to interfere substantially with the victim's liberty. In relying on *Franko*, the court properly determined that the prior misconduct evidence was probative of the defendant's intent to restrain the victim and, thus, was relevant to the count of unlawful restraint in the first degree.

Next, we consider the probative value of the prior misconduct evidence with respect to the count of tampering with a witness. The court found that the prior misconduct evidence was relevant to, inter alia, the defendant's intent to tamper with the victim's statement to the police. In admitting the prior misconduct evidence for this purpose, the court relied on *State* v. *Kantorowski*, 144 Conn. App. 477, 72 A.3d 1228, cert. denied, 310 Conn. 924, 77 A.3d 141 (2013).

In *Kantorowski*, this court determined that prior misconduct evidence of the defendant's two prior assaults of the victim was relevant to the defendant's intent in making subsequent harassing and threatening phone calls. Id., 483, 487. Specifically, this court determined that, "[t]o obtain a conviction for [harassment in the second degree in violation of General Statutes § 53a-183 (a) (3)], the state had the burden to prove, beyond a reasonable doubt, the defendant's intent to harass, annoy or alarm the victim; as to the latter offense [of threatening in the second degree in violation of General Statutes § 53a-62 (a) (2)], the state had to prove the defendant's intent to terrorize the victim . . . [which] means to scare or to cause intense fear or apprehension. . . . Because intent is almost always proved, if at all, by circumstantial evidence, prior misconduct evidence, where available, is often relied upon. . . . When instances of a criminal defendant's prior misconduct involve the same victim as the crimes for which the defendant presently is being tried, those acts are especially illuminative of the defendant's motivation and attitude toward that victim, and, thus, of his intent as

to the incident in question. . . . [T]he defendant's . . . telephone calls need to be understood in [the] context of [the defendant's and the victim's] entire relationship. The uncharged misconduct evidence that the defendant previously had choked the victim and had broken her nose by slamming her face into the floor provided context as to whether he actually intended to cause her to be harassed, annoyed, alarmed or terrorized by his verbal threat." (Citations omitted; internal quotation marks omitted.) Id., 488–89.

In the present case, the court correctly noted that tampering with a witness is a specific intent crime. As our Supreme Court has stated, "[§] 53a-151 (a) applies to any conduct that is *intended* to prompt a witness to testify falsely or refrain from testifying in an official proceeding that the perpetrator believes to be pending or imminent. . . . It is important to note that [i]ntent may be, and usually is, inferred from the defendant's verbal or physical conduct. . . . Intent may also be inferred from the surrounding circumstances. . . . The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct." (Citations omitted; emphasis altered; internal quotation marks omitted.) *State* v. *Lamantia*, 336 Conn. 747, 756–57, 250 A.3d 648 (2020). As in *Kantorowski*, the court in the present case found that the prior misconduct evidence, which contextualized the defendant's instruction that the victim "fix" her statement to the police and tended to demonstrate that the victim reasonably believed that the defendant would use force if she did not comply, was probative of the defendant's intent with respect to his actions. In relying on *Kantorowski*, the court properly determined that the prior misconduct evidence was probative of the defendant's intent to tamper with the victim's testimony. Thus, the court properly determined that the prior misconduct evidence was relevant to the count of tampering with a witness.

Finally, we consider the trial court's determination that the probative value of this evidence outweighed its prejudicial effect. "Section 4-3 of the Connecticut Code of Evidence . . . provides that [r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence. [T]he determination of whether the prejudicial impact of evidence outweighs its probative value is left to the sound discretion of the trial court judge and is subject to reversal only where an abuse of discretion is manifest or injustice appears to have been done. . . . [Our Supreme Court] has previously enumerated situations in which

the potential prejudicial effect of relevant evidence would counsel its exclusion. Evidence should be excluded as unduly prejudicial: (1) where it may unnecessarily arouse the [jurors'] emotions, hostility or sympathy; (2) where it may create distracting side issues; (3) where the evidence and counterproof will consume an inordinate amount of time; and (4) where one party is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) *State* v. *Gerald A.*, supra, 183 Conn. App. 108–109.

The defendant contends that "[t]he probative value of the prior misconduct evidence was not so strong as to outweigh the significant prejudicial tendencies and their effects on the jury." In support of this argument, the defendant maintains that the misconduct evidence was "unduly prejudicial because the history [of domestic violence] noted by the state on numerous occasions was likely to arouse the jurors' emotions and sympathy towards [the victim]." Furthermore, the defendant argues that the misconduct evidence "was distracting in the severity and the amount of time and focus it took in the case," and that "it did not apply to over half the counts . . . ." The defendant's arguments are unavailing.

In the present case, the court admitted evidence of two incidents of prior misconduct. With respect to the evidence of the defendant's first assault of the victim, the victim testified specifically that her "neck was broken" by the defendant. With respect to the evidence of the defendant's second assault of the victim, the victim testified specifically that the defendant "beat [her] with a dog chain . . . ." Our review of the record indicates that no additional evidence was adduced that further elaborated on the details of the first assault and the second assault. As the court correctly noted, the two incidents of prior misconduct did not involve gruesome details, facts or photographs.

In contrast, the crimes of which the defendant was convicted in the present case, although similar to the incidents of prior misconduct, involved conduct and injuries that were substantially more gruesome in nature. Specifically, in light of the evidence presented at trial, the prosecutor described in her closing argument the nature of the defendant's conduct and the victim's injuries as follows: "[B]eginning in November of 2016, [the victim] described to you a series of days where she indicated that [the defendant] beat her. He brought her down the basement where he repeatedly beat her. . . . She described how she was restrained by her hair, dragged down there for a period of three consecutive evenings. . . . In the course of the beating, [the defendant] ripped out large portions of her hair . . . kicked her in the head, choked her to the point of loss of consciousness, beat her by her legs, her back. And as you saw in the photographs that the

[s]tate showed and that were taken at the [veterans administration] [h]ospital of her injuries, she had quite a few as described by the doctor. . . . Dark bruises the doctor indicated from head to toe.'' The prosecutor further argued that ''you'll see these photos again of the external injuries that are going on, there's also internal injuries that she's describing; a broken rib, this hemorrhage that you can see in the photograph to her eye. She also described some blurriness and loss of vision and problems with her eye.''

Given the limited scope of the prior misconduct evidence and the particularly violent nature of the crimes at issue in the present case, we cannot conclude that the prior misconduct evidence was likely to arouse the jurors' emotions and sympathy toward the victim or that it was distracting in the severity, amount of time and focus that it involved.

Furthermore, the court provided a limiting instruction to the jury on the first day of evidence, coincident with the admission of prior misconduct evidence. The instruction restricted the parameters of the state's use of the prior misconduct evidence to limit its prejudicial effect. See footnote 20 of this opinion. In his principal appellate brief, the defendant acknowledges the court's limiting instruction to the jury and that ''the jurors are presumed to have followed such instruction.''

For the aforementioned reasons, the court properly determined that the probative value of the prior misconduct evidence is not outweighed by its prejudicial impact. Accordingly, the court did not abuse its discretion in admitting the prior misconduct evidence pertaining to the first assault and the second assault for the state's proof of unlawful restraint in the first degree and tampering with a witness.

The judgments are affirmed.

In this opinion the other judges concurred.

* This opinion supersedes the opinion of this court in *State* v. *Morlo M.*, 198 Conn. App. 748, 234 A.3d 1137 (2020), which was officially released on July 7, 2020. See footnote 2 of this opinion.

In accordance with our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

[1] The defendant was found not guilty of one count of strangulation in the first degree in violation of General Statutes § 53a-64aa (a) (1) (B).

[2] On October 13, 2020, following briefing, oral argument, and decision in this appeal; see *State* v. *Morlo M.*, 198 Conn. App. 748, 234 A.3d 1137 (2020); the defendant filed a motion to open the judgments, and companion motions to file an additional transcript and for supplemental briefing. He claimed that ''[t]he transcripts that were received, reviewed, filed, and upon which briefing and argument were based, were incomplete.'' Specifically, the basis for the defendant's motions was his discovery of ''a portion of [his] trial transcript, recording a hearing held on the afternoon of September 20, 2017, [which] had never been transcribed or delivered'' to this court (September transcript). The defendant characterized the September transcript as ''the record of a motion in limine hearing that had not previously been provided to counsel, relating to admission of prior misconduct evidence.'' In his motions, the defendant argued that he ''is entitled to have the transcript reviewed by this court and have an additional issue raised and briefed on

appeal: whether the probative value of prior misconduct evidence outweighed its prejudicial tendencies," because the newly discovered transcript "memorializes trial counsel's arguments and objections to the introduction of prior misconduct evidence and the basis for the court's ruling on the motion." On October 20, 2020, this court granted the defendant's motions to open the judgments, to file an additional transcript and for supplemental briefing. Thereafter, the parties submitted supplemental briefs addressing the admission of prior misconduct evidence.

[3] On November 28, 2016, the age of the victim's seven children ranged from approximately fifteen months to thirteen years. The defendant is the father of the victim's four youngest children. Each of the five counts of risk of injury to a child with which the defendant was charged alleged risk of injury as to a different minor child.

[4] The victim's oldest child and her four youngest children accompanied her and the defendant back to Connecticut. The victim's two other children and her nephew were left in Georgia.

[5] The defendant received the following concurrent sentences: fifteen years of incarceration, execution suspended after ten years, followed by five years of probation for assault in first degree; five years of incarceration for unlawful restraint in the first degree; five years of incarceration for each of the five counts of risk of injury to a child; and five years of incarceration for tampering with a witness.

[6] Although the defendant argues that the victim's injuries did not expose her to a risk of death, his argument in this regard appears to be directed to whether the victim suffered a serious physical injury and not to the other elements of § 53a-59 (a) (3). In fact, he specifically states in his principal brief: "It is the appellant's contention that the state failed to prove that the defendant caused serious physical injury to [the victim]." To the extent that the defendant's reference to the victim not having faced a risk of death is a challenge to the statutory requirement that the defendant must have created a risk of death, we are not persuaded. It is the defendant's *actions*, not the results of those actions, which must create a risk of death. See *State* v. *James E.*, 154 Conn. App. 795, 807, 112 A.3d 791 (2015) ("[t]he risk of death element of the [assault in first degree] statute focuses on the conduct of the defendant, not the resulting injury to the victim" (internal quotation marks omitted)), aff'd, 327 Conn. 212, 173 A.3d 380 (2017). The jury reasonably could have concluded that the defendant's *actions* of dragging the victim down the basement stairs and beating her on three consecutive nights was reckless conduct that evinced an extreme indifference to human life and created a risk of death. That his actions may not have resulted in a risk of death is irrelevant.

[7] We note that *Barretta* was decided prior to *Petion*, and that in *Petion*, our Supreme Court remarked that, in *Barretta*, this court did not consider how the dictionary definition of "disfigurement" was modified by the term "serious." *State* v. *Petion*, supra, 332 Conn. 480 n.7. The court in *Petion* declined to express a view as to whether *Barretta* was correctly decided. Id.

Thereafter, the court in *Petion* concluded that the scar from a knife wound on the victim's left arm was insufficient to constitute serious disfigurement. Id., 477, 494–95. Nevertheless, the court stated that it "agree[d] that, in assessing the seriousness of the disfigurement, the jury was not limited to considering the injury in its final, fully healed state. See, e.g., *State* v. *Barretta*, supra, 82 Conn. App. [690] (contusions and severe bruising all over body from beating with baseball bat established serious disfigurement)." *State* v. *Petion*, supra, 322 Conn. 497. The court was not convinced, however, that the appearance of the victim's injury prior to its healing was sufficient to constitute serious disfigurement. Id.

Although *Barretta*'s viability in the wake of *Petion* has not been examined, we conclude that there was sufficient evidence in this case from which the jury reasonably could find that the victim's injuries persisted throughout her head and body and, thus, were sufficient to constitute serious disfigurement under the *Petion* factors.

[8] Although it is not necessary, we discuss an additional type of serious physical injury to the victim that reasonably could have been found by the jury.

[9] The defendant argues that because the victim self-reported her loss of consciousness, without any details as to its timing, and did not receive any treatment, there is insufficient evidence of an impairment of the function of a bodily organ. We disagree because the defendant's arguments correspond to the weight of the evidence that was presented to the jury regarding the victim's loss of consciousness, not its sufficiency.

[10] The defendant argues that the victim's decision not to go to the hospital for further evaluation and, instead, to travel to Georgia with her children, who she was actively caring for, supports a conclusion that the victim did not have a serious physical injury. We reject this argument because the testimony relied on by the defendant does not displace the evidence from which the jury reasonably could have concluded that the victim suffered a serious physical injury.

[11] Contrary to the defendant's argument that his conviction of five counts of risk of injury to a child were based on the children having been found by the police in the basement of the apartment, the state's charging document, the evidence presented at trial, and the state's closing arguments reveal that the basis of the state's charges was the defendant's continuing course of conduct from November 27, 2016, through December 22, 2016.

[12] During oral argument before this court, the defendant's appellate counsel argued that the thirteen year old child could care for the six younger children. Counsel provided no support for this argument and we find it imprudent and unavailing.

[13] The defendant did not contest the sufficiency of the evidence as to the intent element of the charge of assault in the first degree under § 53a-59 (a) (3). See part I of this opinion. We discuss the evidence presented to the jury that supports the defendant's intent to commit an assault to illustrate the severability of that evidence from the evidence supporting the defendant's intent to unlawfully restrain the victim.

[14] The state filed an initial notice of misconduct evidence on September 11, 2017. On September 19, 2017, the defendant filed a "motion in limine for an evidentiary hearing to determine whether the misconduct evidence described in the state's notice filed on September 11, 2017 is admissible in the trial of this case."

[15] In its September 20, 2017 notice of misconduct evidence, the state disclosed that "[t]hese [injuries] [pertaining to the first assault] were the subject matter of the defendant's conviction for assault in the second and third degree in 2013."

[16] In its notice, the state also stated its intent to offer evidence of "[a]n assault in the street in Bridgeport sometime in the course of the defendant's relationship with [the victim]" (third assault), and "[a]n assault wherein the defendant hit [the victim] in the mouth, causing bleeding" (fourth assault).

[17] With respect to the charge of unlawful restraint in the first degree, the state argued that "[t]he evidence is relevant to the defendant's intent, identity, malice, motive, absence of mistake, element of the crime and completing the prosecution story." Specifically pertaining to the elements of the crime of unlawful restraint in the first degree, the state argued that the evidence demonstrates the victim's "fear of the defendant," which is relevant to its proof "that [the victim] did not consent to the restraint."

[18] With respect to the charge of tampering with a witness, the state argued that "[t]he evidence is relevant to the defendant's intent, identity, malice, motive, absence of mistake, element of the crime and completing the prosecution story. Specifically with respect to the elements of the crime of tampering with a witness, the state argued that the evidence is relevant to its proof "that the defendant induced or attempted to induce the witness to testify falsely/withhold testimony/elude legal process."

[19] Previously in its decision, the court noted the exceptions to the general rule prohibiting misconduct evidence as follows: "[The prior misconduct evidence] has to go to prove intent. Again, any malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity or an element to the crime or, finally, to corroborate prosecution testimony."

[20] After the court admitted evidence of the defendant's prior misconduct, it instructed the jury as follows: "I know you heard in my initial instructions this morning that there might be times when evidence is admitted for what is known as a limited purpose. And so my instruction specifically relates to that because there's evidence that was admitted through the course of [the victim's] testimony which was admitted for a limited purpose and so I'm going to instruct you on that right now.

"The state has offered evidence of what is known as other acts of misconduct of the defendant. And I'm going to specifically reference you . . . to the testimony and the questioning that related to prior acts of assaultive behavior and conduct by the defendant upon [the victim], specifically the chain that was referenced and the broken neck, all right. This is not being admitted to prove the bad character, the propensity or the criminal tendencies of the defendant.

"Such evidence is being admitted solely to establish an element of the crime such as the intent, the identity, motive or commission of the crime, absence of mistake or accident and or to complete the story that is being presented by the prosecution. So it specifically goes to those items; intent, identity, motive, absence of mistake or knowledge. You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity.

"You may consider such evidence if you believe it and further find that it logically, rationally and conclusively supports the issues for which it is being offered by the state, but only as it may bear upon those issues; so to establish an element of the crime, to go towards intent, identity, motive, absence of mistake or accident or to complete the story that the prosecution is providing.

"You may consider such evidence if you believe it and further again if you find that it is logically and rationally conclusive of those aspects. On the other hand, if you do not believe that such evidence or even if you do believe it but you find that it does not logically, rationally and conclusively support those issues for which it is being offered by the state you may not consider that testimony for any other purpose.

"You again may not consider evidence of other misconduct of the defendant for any purpose other than the ones that I have just told you, because it may predispose your mind critically to believe that the defendant may be guilty of the offense here charged merely because of the alleged other misconduct. For this reason you may consider this evidence only on the issues again that I told you—motive, intent, malice, to complete the story, to prove an element of the crime to show an absence of mistake and only for those purposes and for no other.

"Now I'm going to add to that by telling you this. This evidence of misconduct does not apply to some of the counts, but does apply to others. It does not apply to count one, assault in the first degree, and it does not apply to any of the risk of injury counts, okay. But it does apply to the unlawful restraint in the first degree, strangulation in the first degree and the count of tampering with a witness, okay.

"So that is again a limiting instruction with regard to how you can use certain pieces of evidence."

[21] In its supplemental brief, the state notes that, "[a]lthough [its] notice of misconduct evidence . . . indicated its intent to offer evidence of other prior misconduct, the record demonstrates that [it] only elicited testimony concerning [the first assault] and [the second assault]." See footnote 16 of this opinion.

[22] General Statutes § 53a-151 (a) provides: "A person is guilty of tampering with a witness if, believing that an official proceeding is pending or about to be instituted, he induces or attempts to induce a witness to testify falsely, withhold testimony, elude legal process summoning him to testify or absent himself from any official proceeding."

[23] In light of the defendant's acquittal of the charge of strangulation in the first degree, the propriety of the court's admission of evidence of the defendant's prior misconduct with respect to that charge is not at issue in this appeal.

———————————————————